

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 0 1 2002

JAMES W. McCORMACK, CL
By:_____
DEP C

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### LITTLE ROCK DIVISION

CYNTHIA BOONE, individually and
as Next Friend of ASHLEY BOONE,                    **PLAINTIFF**

     **-vs.-**                    Case No. 4:01CV00685 SWW

FAY BOOZMAN, in his Official Capacity,
JOHN DOE 1 through JOHN DOE 20,
in their Official Capacities as agents, servants,
employees or Officials of the State of Arkansas,
Department of Health; and CABOT SCHOOL
DISTRICT,                                          **DEFENDANTS**

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT UNDER THE 14TH AMENDMENT

COMES NOW the above-named Plaintiff, by and through her attorneys, Robert T. Moxley of Gage & Moxley and Gregory T. Karber of Pryor, Robertson & Barry, PLLC, in support of the Plaintiff's Motion for Summary Judgment Under the 14th Amendment, filed herein of even date, and respectfully show the Court as follows:

### INTRODUCTION/SUMMARY OF ARGUMENT

The Complaint in this matter asserts that State action is unconstitutional which deprives a school age child of her educational opportunity, solely by virtue of a decision made by her mother to forego routine prophylactic immunization of the child with Hepatitis B vaccine. The general allegations of the Plaintiff's Second Amended Complaint set forth her reliance on "liberty interests," and Court Three seeks relief under the Fourteen Amendment, as provided by 42 U.S.C. § 1983.



Cynthia Boone's highly personal parental decision, made in the exercise of a fundamental parental right, is entitled to full protection under the Due Process Clause of the Fourteenth Amendment. Elements of protection afforded by the Fourth, Fifth, and Ninth Amendments also come into play[1].

The statutory scheme for mandatory vaccination in Arkansas, at A.R.C. § 6-18-702, does not allow for a "personal" or "philosophical" exemption to childhood vaccinations. Children who are not vaccinated are to be excluded from schools[2], unless they are formally "exempted." The parent who seeks to avoid vaccination for a minor child, or the mature child herself, have but two official avenues of refuge: medical contraindication[3], or a curiously codified freedom of religious belief. The former is contingent upon the support

---

[1]The Supreme Court, in *Roe v. Wade*, 410 U.S. 113, 129 (1973), commented that one may "discover" a fundamental privacy right,

> "in the concept of personal 'liberty' embodied in the Fourteenth Amendment's Due Process Clause; or in personal, marital, familial, and sexual privacy said to be protected by the Bill of Rights or its penumbras, see *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Eisenstadt v. Baird,* 405 U.S. 438 (1972); *id.,* at 460, 92 S.Ct. 1029, at 1042, 31 L.Ed.2d 349 (White, J., concurring in result); or among those rights reserved to the people by the Ninth Amendment, *Griswold v. Connecticut,* 381 U.S., at 486, 85 S.Ct., at 1682 (Goldberg, J., concurring)."

[2]Under subsection (e) of the statute, criminal penalties are also provided.

[3]A "physical disability which may contraindicate vaccination" is the specific grounds for medical exemption under A.R.C. § 6-18-702 (d) (1). A curiously selective exemption for children with siblings disabled by the pertussis vaccine is also provided, by subsection (D) (3). This latter subsection is left-handed recognition of the fact that vaccines are not completely safe.

of a licensed physician; the latter is complicated by unconstitutional restrictions which limit exemption to citizen who rely on "recognized" religious tenets and practices in "conflict" with vaccination[4].

The Plaintiffs' Motion for Summary Judgment under the 14th Amendment requires this Court to examine the constitutionality of the "mandatory" immunization statute itself, not for its very existence, but for the draconian sanctions it levies. The State of Arkansas has no compelling interest to justify the denial of all formalized educational opportunity as punishment for the parental refusal—a typically **informed** refusal—to subject a child to a questioned, preventative medical procedure.

Under the Constitution, quite apart from the freedom of religion, refusing a mandatory and prophylactic medical procedure **must** be held to be privileged. Plaintiff seeks a declaratory judgment which would prevent unimmunized children from being excluded from schooling, **absent** the declaration of a public health emergency which would justify such a temporary action, under the police power[5]. The properly comprehensive injunctive and declaratory relief would grant long-overdue recognition to the right of self-determination in the matter of vaccinations. Refusal—or choice in the matter—represents the exercise of a traditional and sacred parental right.

---

[4]The First Amendment of the United States Constitution underpins another Motion for Summary Judgment of even date.

[5]The requested injunction would not prohibit mass immunization, nor prohibit rule-making to require that certain vaccines be offered and urged upon everyone.

The State will rely herein on an alleged "constitutional doctrine" of mandatory vaccination which arose at the very beginning of the 20th Century. In the leading 1905 case[6], the Supreme Court upheld a criminal sanction in the form of a five-dollar fine for refusal to submit to a smallpox vaccination during a declared state of emergency.   The 1922 case declined jurisdiction over an "equal protection" challenge to vaccination of school children. By contrast, supporting the right to informed consent (and its correlative, the right to **withhold** consent) is a long line of "substantive due process" jurisprudence which evolved over the entire course of the Twentieth Century.

The Supreme Court has fully embraced the right of American citizens to free will and self-determination *inter alia* in such simple matters as the education of their children, and **has**, at times, invoked the First Amendment in the defense of such rights[7]. But as delineated in a "right to privacy" jurisprudence under the Fourteenth Amendment, which goes even so far as to allow for "nontherapeutic" abortion on demand in the first trimester of pregnancy, the Supreme Court has given flesh to parental and individual rights which far exceed the reach of the First Amendment.   Especially in the area of parental rights, a recent case[8]

---

[6]*Jacobson v. Massachusetts,* 197 U.S. 11 (1905) required an adult's submission to vaccination on the basis of a local government's formal resolution which recited, *inter alia,* that smallpox was "prevalent . . . and still continues to increase." In *Zucht v. King,* 260 U.S. 174 (1922), the Supreme Court simply cited *Jacobson,* stating that compulsory vaccination is within the police power.

[7]*See, e.g., Pierce v. Society of Sisters,* 268 U.S. 510, 534-535 (1925).

[8]*Troxel v. Granville,* 530 U.S. 57 (2000).

concerning grandparent visitation has resulted in the reaffirmation of the preeminence of parental rights above the power of the State. Other cases in the high court, concerned with personal autonomy issues—forced medical treatment, the right to die, etc.—lend great strength to Plaintiff's position. These authorities construct the right to decline vaccination, to choose one's own method of avoiding disease, of broader constitutional dimension than "religious exemption."

This brief will also discuss the interplay between the societal and individual interests which favor **keeping** Ashley Boone in school, and compare them to the **single** public health interest—the interest in easy enforcement of full participation in the vaccination program—which underlies the sanction of exclusion from school. It will also explore in depth the individual parental interests which bear upon the decision to vaccinate.

The United States Constitution will be shown herein as the bulwark of interests which overcome the contemporary and modern public health interest in efficient creation of herd immunity, an interest which has displaced and supplanted the far more compelling interest—containment of the smallpox emergency—which gave birth to the statutory template of excluding unvaccinated children from school[9]. This sanction—unchanged since the 19th Century—no longer serves or constitutes a compelling governmental interest.

Under both the Fourteenth and First Amendments, the state's "compelling interests"

---

[9]Plaintiff commends the Court to the historical discussion of "mandatory vaccination" statutes in *Jacobson*, 197 U.S. at 31-32.

are to be compared to the interests served by the Constitutional rights being exercised[10].  In

this Constitutional calculus, the legislation under review is defective unless the State's

interests overcome the interests of the citizen.  This Court will find no such compelling state

interest.

### ARGUMENT ONE: THE PARENT'S RIGHT TO DECIDE IN THE MATTER OF CHILDHOOD VACCINATION IS PROTECTED BY THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT

#### A.  Defining the "Liberty Interest."

"(T)he outlines of the 'liberty' specially protected by the Fourteenth Amendment—never fully clarified, to be sure, and perhaps not capable of being fully clarified—have at least been carefully refined by concrete examples involving fundamental rights found to be deeply rooted in our legal tradition. This approach tends to rein in the subjective elements that are necessarily present in due-process judicial review. In addition, by establishing a threshold requirement—that a challenged state action implicate a fundamental right—before requiring more than a reasonable relation to a legitimate state interest to justify the action, it avoids the need for complex balancing of competing interests in every case." *Washington v. Glucksberg*, 521 U.S. 702, 722 (1997).

The Supreme Court of the United States has been called upon, sometimes unwillingly,

to circumscribe the boundaries of the "fundamental right to privacy."  Even in cases,

however, where Supreme Court majorities **limited** the right to freedom, *e.g.,* finding no right

---

[10]"Compelling Interest" analysis is not limited to First Amendment cases.  The Supreme Court has stated, in *Roe v. Wade*, 410 U.S. at 155:

"Where certain 'fundamental rights' are involved, the Court has held that regulation limiting these rights may be justified only by a 'compelling state interest.'"

to engage in homosexual sodomy[11], or upholding the **regulation** of the parent-child relationship[12] between an adulterous illegitimate parent and child, the outer limits of State infringement of individual rights are capable of ascertainment. For instance, in *Bowers* the majority, in reliance on the longstanding criminal nature of sodomy, rejected the suggestion (on behalf of Justices Blackmun, Brennan, Marshall, and Stevens) that focus should instead be placed on a right to privacy and autonomy in matters of sexual intimacy. Brennan, joined by Marshall and Stevens, authored another dissent, which argued that prior cases had indeed made consensual adult sodomy into a fundamental liberty right.

In *Michael H. supra*, five Justices agreed that a liberty interest was implicated, in the case of the parent-child relationship itself. And Justice Scalia, joined by Chief Justice Rehnquist in a separate segment of the plurality decision, argued for "the most specific level at which a relevant tradition protecting, or denying protection to, the asserted right can be identified." *Id.* at 128 n.6. Significantly, under *Michael H.* the right to "regulate" does not mean that there is no fundamental right. "Police power" would not be **erased** in the event of relief herein. And the "relevant tradition" has protected parental rights in every other realm.

The "tradition" test is not difficult to apply in this case. The Courts are not divided

-------------------

[11]*Bowers v. Hardwick*, 478 U.S. 186 (1986).

[12]*Michael H. v. Gerald D*, 491 U.S. 110 (1989).

on the notion that parents have the right to consent to medical treatment for children[13]; neither is doctrine appreciably dissonant—except with regard to the vaccination decision[14]—in the realm of the limitations on state power to order or force medical treatment upon minors over parental objection[15].

In *Michael H.,* dissenting Justices Brennan, Marshall and Stevens disfavored the emphasis on tradition, and argued instead that the Court should "ask whether the specific parent-child relationship under consideration is close enough to the interests that we already have protected [as] an aspect of 'liberty.'" *Id.* at 142.  Plaintiff passes this test, as well.

The finding of a "fundamental right" seems to be a no-brainer.  For fifty years, starting with *Rochin v. California,* 342 U.S. 165 (1952), the Supreme Court has repeatedly affirmed the right of personal bodily integrity.  Indeed, the right is one arising from the common law:

> "No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and

---

[13]*See* Annotation, 67 ALR4th 511 ("Medical Practitioner's Liability for Treatment Given Child Without Parent's Consent").  The clear general rule is that parents must consent before medical treatment is rendered, in the absence of emergency.

[14]*See,* 94 ALR5th 613 ("Power of Court or Other Public Agency to Order Vaccination Over Parental Religious Objection").

[15]*See,* Annotations, 21 ALR5th 248 ("Power of Court or Other Public Agency to Order Medical Treatment Over Parental Religious Objections for Child Whose Life is Not Immediately Endangered") and Power of Court or Other Public Agency to Order Medical Treatment for Child Over Parental Objections Not Based on Religious Grounds").  Except where state statutes grant the power to force treatment on children which will improve their life, it is the norm that only a true emergency can justify intervention over the objections of parents, and religious objections seem somewhat more protected than secular objections.

unquestionable authority of law. As well said by Judge Cooley: 'The right to one's person may be said to be a right of complete immunity; to be let alone.' Cooley, Torts, 29." *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891).

Far from overruling *Botsford,* the Court in *Jacobson* made no mention of it at all, stating "It is not, therefore, true that the power of the public to guard itself against ***imminent danger*** depends in every case involving the control of one's body upon his willingness." *Id.,* 197 U.S. at 29, emphasis added. But only the concept of "imminent danger" will reconcile *Jacobson* with *Botsford,* in its explication of a rule that is straight-forward:

> "To compel any one, and especially a woman, to lay bare the body, or to submit it to the touch of a stranger, without lawful authority, is an indignity, an assault, and a trespass; and no order of process, commanding such an exposure or submission, was ever known to the common law in the administration of justice between individuals, except in a very small number of cases, based upon ***special reasons***." *Id.,* at 251, emphasis added.

A fundamental right is one "so rooted in the traditions and conscience of our people," *Snyder v. Massachusetts,* 291 U.S. 97, 105 (1934), *overruled in part, Malloy v. Hogan* 378 US 1 (1964) as to be "a cherished value in our society." *Schmerber v. California,* 384 U.S. 757, 772 (1966) (finding such value in the "integrity of an individual's person"). Accordingly, *Rochin, supra,* at page 174, describes an unauthorized physical invasion of the body as "offensive to human dignity."

The Supreme Court's "right to die" cases[16] also attest to these values; in *Glucksberg,*

---

[16]*See Washington v. Glucksberg, supra* (upholding Washington state ban on assisted suicide) and *Cruzan v. Missouri Department of Health,* 497 U.S. 261 (1990) (holding that due process did not require state to allow family members to direct cessation of life support (continued...)

at 720, the Court cited *Cruzan* and stated, "We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment."

In the year 1905, the "liberty" interest under the Constitution was nominally at issue in *Jacobson*[17]. But since **at least** the time of *Roe v. Wade*, it has been accepted that a **modern** form of analysis of due process and infringement on liberty interests is central to 14th jurisprudence. The Court opinion in that case spent 18 pages of discussion, reviewing the lengthy history of the medical and legal views of abortion. This review apparently convinced the Court that the longstanding historical prohibition of abortion lacked the solid foundation necessary to preserve such prohibitions from constitutional review. *Id.,* 410 U.S. at 129-47. Hence, the fact that it has "always been this way" is no saving grace for *Jacobson.*

*Roe* makes clear that the initial analytical focus is upon the right to decide, the right being asserted. Herein, the issue is "choice"—or even "medical choice"—on the part of a **living** child's parent. The choice is whether or not to undergo the medical procedure, whereby infectious agents will be injected into the child's body, in the effort to trigger an immune response

Is this a "liberty interest?" The answer is clear. And therefore "compelling interest"

---

[16](...continued)
on substituted judgment of close family members **absent** substantial proof that their views reflected those of patient).

[17]*Jacobson* and *Zucht* are utterly archaic in 14th Amendment substantive due process terms, and worthless as precedent in light of the extensive jurisprudence of the 20th Century.

scrutiny applies. *Roe, supra,* 410 U.S. at 155. It is clear that medical choice, and its essence, "consent" to government intrusion, fit every test of protected liberty interest[18]. Balancing the governmental intrusion with the right being asserted, Plaintiff's detriment greatly outweighs the benefit of the mandatory vaccination program as structured.

### B. Comparing Fundamental Rights to "Compelling State Interests"

The Supreme Court in a long series of cases has struck down laws limiting or prohibiting abortions in practically all the States, the District of Columbia, and the territories These laws were invalidated by numerous rulings, all recognizing a right of personal privacy protected by the due process clause that includes a qualified right of a woman to determine whether or not to bear a child. Can the State of Arkansas seriously contend that **prophylactic** vaccination is **more** compelling than the interests which states have asserted in the abortion debate? And that the right to exclude Ashley Boone from school is justified because her mother opposes vaccination against a disease—Hepatitis B—which is only **marginally** contagious? This fact is material, and it is not in dispute. The farther away from emergency we travel, the less compelling is the State interest.

---

[18]Extrapolation of values is appropriate herein, as in *Moore v. City of East Cleveland,* 431 U.S. 494 (1977), where the Court invalidated a criminal law which prevented extended family from living together in a residence. At 501 the Court stated,

> "unless we close our eyes to the basic reasons why certain rights associated with the family have been accorded shelter under the Fourteenth Amendment's Due Process Clause, we cannot avoid applying the force and rationale of these precedents to the family choice involved in this case."

The jurisprudence regarding abortion has featured many implementations of compelling interest analysis. Of interest to this case is Justice O'Connor's "undue burden" approach, taken from *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833 (1992). "What is at stake," Justice O'Connor wrote, for a three-judge plurality, "is the woman's right to make the ultimate decision, not a right to be insulated from all others in doing so. ***Regulations which*** do no more than ***create a structural mechanism*** by which the State . . . may express profound respect for the life of the unborn ***are permitted***, ***if they are not a substantial obstacle to*** the woman's ***exercise of the right*** to choose." *Id.,* at 878, emphasis added. Thus, the test continues, **unless** an undue burden is imposed, states may adopt measures "designed to persuade [a woman] to choose childbirth over abortion." *Ibid.*

A **personal exemption** to the "mandatory" immunization program would save the constitutionality of the "exclusion" sanction. And as matter of preserving the essentials of the vaccine program, to require parents to apply for and receive the exemption would allow the record-keeping which is now considered essential, and also emphasize the **desire** of the State for "universal" immunization. The sanctions constitute the *Casey* "undue burden."

The rubric of the early abortion cases was frequently in terms of a right vested in the physician and the woman he treats. In *Roe v. Wade, supra,* abortion is referred to a "medical choice." In the first trimester of pregnancy, the State has no "compelling interest" and "the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated." *Id.,*

12

410 U.S. at 163. By the time of *Casey,* however, the abortion was called "nontherapeutic." It clearly the law, then, that a **nontherapeutic** choice is a constitutional right. And the more remote the medical crisis in the body of the **patient**, the more remote is the compelling interest of the State.

It is not denied that state interests are served by implementation of an immunization program. However, just as the state interests in *Roe v. Wade* were placed by the Court into a continuum, the interests of the State Public Health Department are incremental in this matter as well. The first increment of interest is in the prophylactic measure itself, that is, the "herd immunity" which has been described. This is an interest which is completely different than the interest at stake in *Jacobson*, which was directed toward preventing the spread of an ***ongoing*** epidemic. As cited in *Cruzan, supra,* 497 U.S. at 278, *Jacobson* was about **smallpox**:

> "In Jacobson v. Massachusetts, 197 U.S. 11, 24-30, 25 S.Ct. 358, 360-361, 49 L.Ed. 643 (1905), for instance, the Court balanced an individual's liberty interest in declining an unwanted smallpox vaccine against the State's interest in preventing disease."

The **specific** "interest" is the source of the value judgment in the individual case. It is time to revisit the **specific** value judgment of *Jacobson,* to recognize that the "compelling" nature of the interest has changed. As noted by the *Cruzan* decision, "The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from (*Jacobson*)." *Id.,* p. 278.

The current state interest must be compared with two competing values, (1) the right

of the parent to determine the child health issues which fall on the parent as guardian of the child, and (2) the right to a free and appropriate public education. This calculus has changed in the more than nine decades since *Jacobson*. Moreover, the interest in preventing an epidemic is provided for in the public health laws (*e.g.,* A.R.C. §§ 14-47-130; 20-57-203) **without** the need to deny children, unvaccinated **by choice**, the benefit of a free and public education.

A second—and more remote—increment of State interest may well be to prevent the disease from occurring **in the actual child.** Clearly, the State expresses such an interest, and urges that interest upon the parents. But that interest is countervailed by the freedom of the patient, and the freedom of his guardians. The right to consult with a medical doctor, or to arrive at medical decisions on the basis of the free exchange of information which is available in the 21st Century marketplace of ideas, and in that context to decide on preventative measures, clearly outweighs the State's choice of preventative treatment modality.

## C. The insights of *Troxel v. Granville*

No case is more explicit in its description of the progress wrought by the 20th Century in the recognition of civil liberties than *Troxel v. Granville, supra.* Pertinent to the instant case, its analysis begins:

> "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, in Meyer v. Nebraska, 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), we held that the 'liberty' protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children' and 'to control

14

the education of their own.' Two years later, in Pierce v. Society of Sisters, 268 U.S. 510, 534-535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), we again held that the 'liberty of parents and guardians' includes the right 'to direct the upbringing and education of children under their control.' We explained in Pierce that '[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.' Id., at 535, 45 S.Ct. 571. We returned to the subject in Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' Id., at 166, 64 S.Ct. 438." *Troxel,* pp. 65-66.

The Court went on, before declaring unconstitutional a statute which showed no deference to the parental decision to control grandparent visitation:

"In subsequent cases also, we have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children. See, e.g., Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) ('It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children "come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements"' (citation omitted)); Wisconsin v. Yoder, 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ('The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition'); Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) ('We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected'); Parham v. J. R., 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) ('Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course'); Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (discussing '[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child'); Glucksberg, supra, at 720, 117 S.Ct. 2258 ('In a long line of cases, we have held that, in

addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the righ[t] ... to direct the education and upbringing of one's children' (citing Meyer and Pierce)). In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel, supra,* p. 66.

The insights of *Troxel* and its progenitors are clearly controlling over *Jacobson,* which did not involve parental rights at all. Neither does *Zucht* pertain to the plaintiff's case, with its "rational basis" analysis and limited scope of review[19].

## ARGUMENT TWO: THE COMPELLING INTEREST OF THE PUPIL IN A FREE AND PUBLIC EDUCATION COUNTERVAILS ANY INTEREST IN THE SANCTIONS WHICH ENFORCE SUBMISSION TO BLANKET IMMUNIZATION

To adjudicate the State's "compelling interest" in this matter, the Court must temper any finding with recognition of the countervailing interest of the State in **not** excluding children from school. The sanction which the State seeks to uphold, in the rubric of the abortion controversy, can be expressed in terms of a "ban," the ultimate prohibition of the parent's choice.

Under the cases from *Roe* to *Casey,* viability of the fetus—*i.e.,* a life-and-death question—marks ***"the earliest point*** at which the State's interest . . . is constitutionally

---

[19]The very procedure used in *Zucht*—a writ of error—is archaic.   Dismissing the writ, and commenting upon the constitutional challenge to the vaccination statute—also clothed in outmoded,"equal protection" terms—the Court stated, "questions of that character can be reviewed by this court only on petition for a writ of certiorari." *Id.,* 260 U.S. at 177. Thus the Court declined to decide an "equal protection" claim.

adequate to justify a legislative ban." *Casey,* 505 U.S. at 860, emphasis added.  Similarly, an ongoing epidemic marks the "earliest point at which the State's interest" is constitutionally adequate—even under Jacobson—to allow the State to ban children from the attendance in schools, or levy a criminal penalty.

The impacted interest of the plaintiff and her daughter—and by extension, the interest common to the entire class of vaccine objectors—is in fact a compelling interest in and of the State of Arkansas.  The right to a free and appropriate public education is subject to legislative findings in Arkansas Revised Code § 6-20-302 (a):

> "The General Assembly recognizes that intelligence and virtue are the safeguards of liberty and the bulwark of a free and good government and that the Arkansas Constitution, Article 14, § 1 requires the state to ever maintain a general, suitable, and efficient system of free public schools and to adopt all suitable means to secure to the people the advantages and opportunities of education."

Compelling also is the State interest that children **attend** schools.  Section 6-18-201 enforces compulsory attendance; § 6-18-202 provides that schools shall be free.

The Supreme Court of Arkansas has not found it necessary to decide whether education is a fundamental right, but citing a Connecticut opinion[20] has stated,

> "even without deciding whether the right to a public education is fundamental . . . . we believe the right to equal educational opportunity is basic to our society. 'It is the very essence and foundation of a civilized culture: it is the cohesive element that binds the fabric of our society together.' Horton, 376 A.2d at 377, Bogdanski, J. conc. Education becomes the essential prerequisite that allows our citizens to be able to appreciate, claim and effectively realize

---

[20]*Horton v. Meskill*, 172 Conn. 615, 376 A.2d 359 (1977).

their established rights. The opening phrase to our constitutional mandate for a public school system underscores the truth of the principle. 'Intelligence and virtue being the safeguards of liberty and bulwark of a free and good government, the State shall ever maintain a general, suitable and efficient system of free public schools... (Art. 14 § 1)." *DuPree v. Alma School Dist. No. 30 of Crawford County*, 651 S.W.2d 90, 93 (Ark. 1983).

Finally, the right to attend school presents an intermix of property interests intertwined with the liberty interests. In *Goss v. Lopez*, 419 U.S. 565, 574 (1975), the Court stated "Among other things, the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause." Noting the stigma of expulsion, the Court prescribed procedural due process for those who are expelled; ironic indeed would be a decision upholding "legislative expulsion" for conduct that is simply an exercise of legitimate parental rights.

### ARGUMENT THREE: THE MEDICAL CULTURE OF CONTEMPORARY AMERICAN LIFE INCLUDES THE SETTLED EXPECTATION OF A RIGHT TO EXERCISE INFORMED CONSENT.

As a matter of undisputed fact, vaccinations are a medical procedure. They have medical consequences—which the State might minimize—and the procedure itself is most clearly a common-law battery. Moreover, vaccination is **not** harmless[21]. The dispute then,

---

[21]In passing the National Childhood Vaccine Injury Compensation Act, 42 U.S.C. § 300aa-10 *et seq.,* Congress found, "There is today no 'perfect' or reaction-free childhood vaccine on the market. A relatively small number of children who receive immunizations each year have serious reactions to them. But it is not always possible to predict who they will be or what reactions they will have." H.R. Rep. 99-908, 99th Cong.,2nd Sess. 1986, 1986 U.S.C.C.A.N. 6344, 1986 WL 31971 (Leg.Hist.).

is whether the right to self-determination in matters which involve the sanctity of one's own body, of the body of one's child, countervails over the compelling interests of the State. The conclusion regarding this issue was long ago set down in the Constitutional fabric of American law, and the conclusion is foregone, in this, the second year of the Twenty-First Century.

### A. Contemporary values of the "pro vaccine" faction:

The "pro vaccine" side of the mandatory immunization debate is not necessarily hostile to a right of informed consent. Gregory A. Poland, MD, of the Mayo Vaccine Research Group, in an editorial entitled, "Vaccine Safety: Injecting a Dose of Common Sense" published in the Mayo Clin Proc, 2000; 75:135-139, states in pertinent part:

> "our own view is that the role of the government is to inform, educate, recommend, and even provide incentives for immunization—but not to mandate without exclusion acceptance among the civilian population. Informed refusal must remain an acceptable choice in a free democracy, and the culture of informed consent, with both religious and philosophical exemption, must be maintained."

*   *   *

> "Coupled with informed debate, we must use science, technology, and common sense to our maximum advantage, while maintaining rights of freedom of choice . . ."

### B.  Value statements by opponents of the vaccine establishment

On the subject of informed consent, the founder of Dissatisfied Parents Together[22],

---

[22]The parents group, "DPT," was a major proponent of the National Childhood
(continued...)

Barbara Loe Fischer, made an opening statement on the occasion of a Vaccine Safety Forum

at the Institute of Medicine (IOM) in 1995.  Her remarks included details of the founding of

Dissatisfied Parents Together in 1982 and then the National Vaccine Information Center in

1989, with "one goal: the prevention of vaccine injuries and deaths through public

education."  She also stated,

> "With the repeal of the military draft in the 1970's, mandatory vaccination is
> the only law in America which requires a citizen, in effect, to risk his life for
> his country. And when the draft was in effect during times of war the
> difference was that the young men being required to risk their lives were 18
> years old and had the right to choose to conscientiously object. They were not
> 8 hour or 8 week old infants incapable of making that decision for themselves."

Ms. Fischer leads one of many organized proponents in a fight with the public health

establishment.  As a defender of parental rights, she experiences a state of conflict, stating,

> "You cannot take away freedom and force people to violate their conscience
> and expect to get away with it. Maybe in the Gulag or in Peking. But not in
> America.  In this politically charged debate I believe there will be no winners,
> only losers, if the two sides fail to find a way to intelligently coexist."

Concluding, Ms. Fischer states a basis for "philosophical objection" which would be

an unacceptable statement of objection under the statutory laws of the State of Arkansas:

> "With that, I want to make it clear, hopefully for the last time, that the National
> Vaccine Information Center has never told anyone not to vaccinate. That is not
> a decision that is ours to make. We have always provided information on
> disease risks because we believe health care consumers should know how
> serious those risks can be. We do not advocate elimination of vaccines.

---

[22](...continued)
Vaccine Injury Compensation Act.

"We maintain that the least toxic and most technologically advanced vaccines that can be produced should be made available to Americans as a preventive health care choice; that vaccine risks should be fully defined and communicated; and that high risk individuals should be identified. Simultaneously, in the spirit of the Bill of Rights in the American constitution, the provisions of the Nuremberg Code and the Helsinki Declarations as well as the tenets embodied in the scriptures of every major religion, we also maintain that American citizens should have the right to informed consent; the freedom to obey the judgement of their conscience; and should never be forced to engage in any medical procedure which carries the risk of injury or death against their will."

In *United States v. Stanley*, 483 U.S. 669, 710 (1987), Justice O'Connor, dissenting, relied on the Nuremberg Code for the proposition that due process guarantees vest the subjects of human experiments with a right of action based upon the breach of the right to voluntary and informed consent. *See also In re Cincinnati Radiation Litigation*, 874 F.Supp. 796, 822 (SD Ohio 1995). The American Association for Health Freedom, in a position paper on vaccination, refers to hearings before the Senate Committee on Governmental Reform, where:

"Milwaukee immunologist Burton Waisbren, a veteran clinical investigator, told a house oversight subcommittee on federal health policy that 'an injustice is being done to the children of this country.' He labeled infant hepatitis B vaccination 'an experiment sponsored by the Center for Disease Control (CDC) which is designed to determine if vaccination at birth of all babies in the United States will eventually decrease the frequency of cancer of the liver.' The position paper continues:

"AAHF believes parents should be informed of their right to omit or simply postpone shots like the hepatitis B vaccine. The right to informed consent to any medical procedure carrying the risk of injury or death, such as vaccination, has been the prevailing ethical standard in medical care since the Nuremberg Code and Helsinki Declarations became part of international law after World War II. With increasing numbers of vaccines being developed and even

21

mandated for school-age children, we believe parents should have the right to philosophical or conscientious belief exemptions for their children."

Pediatrics practice has a strong ethical thrust toward the doctrine of informed consent. The American Academy of Pediatrics (AAP) Committee on Bioethics published a strong statement in *Pediatrics* 1995;95:314-317. Among its pertinent statements are recognition of the role of parents:

> "Only patients who have appropriate decisional capacity and legal empowerment can give their informed consent to medical care. In all other situations, parents or other surrogates provide informed permission for diagnosis and treatment of children with the assent of the child whenever appropriate."

Moreover, the broad nature of informed **non**-consent is justifiable in terms of the risk-benefit analysis:

> "A patient's reluctance or refusal to assent should also carry considerable weight when the proposed intervention is not essential to his or her welfare and/or can be deferred without substantial risk."

## CONCLUSION

In terms of American freedom, the right to make informed and even controversial medical choices is sacred under the Fourteenth Amendment. The State has no more right to **intrude between** the physician and the patient than it has to **act** as the surrogate and omnipotent physician **for** the citizen-patient. Thus, it is not only people of devout religious persuasion who have the right not to be treated as second class citizens. Informed adult citizens have the right that their parenting and medical choices be honored, and not punished, by the State. Parents have the right to make their own medical judgments, even if the State

believes that the judgment is incorrect, so long as that judgment is not an active force which threatens the **very life** of their child.

The "exclusion from-school" statutory scheme was designed specifically to combat smallpox. The survival of its draconian structure into the 21ˢᵗ Century is unworthy of a free society which cherishes the free exchange of ideas and strives to inculcate respect for individual freedoms.

Plaintiff brings the most important and overlooked aspect of constitutional law to the question of whether mandatory vaccination is a viable legal construct. Plaintiff contends that "mandatory" vaccination—a program which denies the right to informed consent—is a fundamental violation of the constitutional rights to liberty and privacy. The cases in which the Supreme Court has recognized the right to control one's own body, the right to make one's own medical choices, and the right to control the health issues which arise in the rearing of one's family, mandate the conclusion that forced prophylactic vaccination is a violation of these fundamental American rights. As matter of American freedom, the right to informed consent—and its correlative, informed **refusal**—cannot be disallowed.

Citizens of the State of Arkansas, as citizens of the United States, have the right to object to vaccination of their children, for any reason, rational or irrational, so long as that objection does not unacceptably endanger the health of the child. The "unacceptable" point is clearly not present in the purely hypothetical possibility that if a few families think for themselves, some upsurge in communicable disease might occur. The State Department of

Health has every right and interest in promoting herd immunity. It has no right whatsoever

to exclude children from public education, to punish non-acceptance of its program.

Dated this 30 day of April, 2002.

Respectfully submitted,

PRYOR, ROBERTSON
    & BARRY, PLLC
315 North 7th Street
P.O. Box 848
Fort Smith, AR 72902-0848
(501) 782-8813

Gregory T. Karber
Ark. Bar No. 79110
Attorney for Plaintiff

Robert T. Moxley #5-1726
GAGE & MOXLEY
623 West 20th Street
Post Office Box 1223
Cheyenne, Wyoming 82003
(307) 632-1112
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I served the requisite number of copies of the

foregoing document, to the entity or entities listed below, by placing same into the hands of

the delivery service designated below, on this 30 day of _____, 2002.

UPS Next Day Delivery [    ] United States Mail [X] Federal Express [    ] Overnight Mail [    ] _____ [    ]

WILLIAM C. BRAZIL, ESQ.
913 Oak Street
Conway, Arkansas 72032

ROBERT M. BRECH, ESQ.
Associate General Counsel
Arkansas Department of Health
4815 Markam Street, Slot 31
Little Rock, Arkansas 72205-3867