

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### LITTLE ROCK DIVISION

MAY 0 1 2002
JAMES W. McCORMACK, CLER
By:_____
DEP CLEF

CYNTHIA BOONE, individually and
as Next Friend of ASHLEY BOONE,

                                                    **PLAINTIFF**

      -vs.-                          **Case No. 4:01CV00685 SWW**

FAY BOOZMAN, in his Official Capacity,
JOHN DOE 1 through JOHN DOE 20,
in their Official Capacities as agents, servants,
employees or Officials of the State of Arkansas,
Department of Health; and CABOT SCHOOL
DISTRICT,

                                        **DEFENDANTS**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT UNDER THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

COMES NOW the above-named Plaintiff, by and through her attorneys, Robert T. Moxley of Gage & Moxley, Cheyenne, Wyoming, and Gregory T. Karber of Pryor, Robertson & Barry, PLLC, and in support of Plaintiff's Motion for Summary Judgment Under the First Amendment of the United States Constitution, of even date, respectfully shows the Court as follows:

### INTRODUCTION/SUMMARY OF ARGUMENT

The facts of this matter are not in dispute. A simplistic statement of facts is filed in support of Motion for Summary Judgment filed by the Separate Defendant Faye Boozman. Additional undisputed facts are set forth in that defendant's brief. More extensive facts—also undisputed—are filed herewith in the statement required by Local Rule 56.1 (a). And the Transcript of the Preliminary Injunction hearing is filed herewith; previously, in the



wake of a similar hearing[1], conducted November 6, 2001, in the Western District, in the case of *McCarthy v. Boozman,* Case No. 01-2265, Plaintiff filed the Magistrate Judge's Report and Recommendation, in this record.

This matter became a genuine controversy, despite the lack of an admittedly futile, formal "application" for exemption, when the Plaintiff was informed by Cabot schools that Ashley Boone was in danger of exclusion from school, and that immunization would be the only way that she would be admitted. Correspondence between counsel and the defendants made it clear that no religious exemption would be provided.

The material facts are not in dispute concerning the vaccine in question, designed to prevent Hepatitis B. Nor is there material dispute surrounding the disease itself. Significantly, as shown by the testimony of Dr. David Bourne, M.D., a doctor with the Arkansas Department of Health, Hepatitis B is not spread by casual contact. (Transcript—hereinafter "TR"—of Preliminary Injunction Hearing, p. 133.) The disease itself is most dangerous to infants, and probably less than ten percent of adults will develop chronic infection if ever they become infected. (TR at 134-35.) Ashley Boone's risk, without being vaccinated, of developing the disease, if **not** infinitesimal (in the transcript, "infanticidal"), are admittedly "fairly low." (TR at 143.) She is in the group—as apparently, are all her classmates—with only ten percent risk of chronic infection in the event of

---

[1] Daniel McCarthy, the Plaintiff in the Western District, testified as a witness herein. The findings of the Magistrate Judge in the McCarthy matter were previously filed for the record in this case.

contracting the disease. *Ibid.* There is no legitimate concern that religious exemptions in the Cabot schools might jeopardize the immunization effort. (TR at 145.)

The requested relief under Count One and Court Two of the Complaint is an injunction, which prohibits the State from pursuing a scheme created—perhaps unwittingly[2], in terms of its **regulation** of religion—by the Arkansas General Assembly. As implemented, this scheme requires the State Department of Health to make inquiry into the bona fides of claims for religious exemption from "mandatory" childhood vaccination. The Department will then grant an exemption only according to the unfortunate statutory language whereby a "recognized church or religious denomination" is required, along with "tenets and practices" abjuring resort to vaccination.

In the common circumstance where a parent's religious objections do not qualify, the child—like Ashley Boone—is denied admission to public (or private) schools[3]. To underlie the injunction against this consequence, Plaintiff seeks a declaratory judgment to declare that "regulation" of religious claims is unconstitutional, and that the First Amendment of the United States Constitution requires an individual exemption.

---

[2]The constitutionally defective statutory provisions are found in subsection (d)(2) of Arkansas Revised Code § 6-18-702. Subsection (d)(2) is unquestionably intended to honor religious freedom of choice.

[3]The provisions of § 6-18-702 (e) also create a **criminal** sanction, stating, "Any person found guilty of violating the provisions of this section or the regulations promulgated by the State Board of Education or the division for the enforcement hereof shall be guilty of a misdemeanor." *A fortiori,* if the sanction of exclusion from school is constitutionally invalid, so is the criminal penalty.

Individual exemptions are appropriate which allow children to attend school in the absence of declared emergency. Consistent with the "police power" vested in public health authorities, under the Constitution, an exempted or unvaccinated student may **only** be excluded from school in the event of an outbreak of "vaccine preventable" disease which impacts the student or the school.

This Court's attention has been fully directed, in the context of the briefing which occurred with regard to the TRO and preliminary injunction motions[4], to the basic premises of the Plaintiff's case. Plaintiff's briefs in support of the motion for TRO and preliminary injunction demonstrate the imminent threat of deprivation of the right to attend school—a property right[5]. These prior briefs have demonstrated that the State, by forcing the Plaintiff to choose between schooling for her daughter and following the dictates of her conscience, has substantially burdened the free exercise of religion[6].

The hearing process has fully illuminated the public health concerns which are pivotal

---

[4] Plaintiff directs the Court to "Plaintiff's Combined Memorandum and Motion for Order Continuing and Extending Preliminary Injunction," as well as "Plaintiff's Response to Defendants' Motion to Dismiss; Argument, Points, and Authorities."

[5] The property interest "arise(s) from   . . . state statutes . . . (and) mutually explicit understandings." *Abercrombie v. City of Catoosa, Oklahoma,* 896 F.2d 1228, 1231 (10th Cir. 1990), citing *Dickeson v. Quarberg,* 844 F.2d 1435, 1437 (10th Cir. 1988). *See also Goss v. Lopez,* 419 U.S. 565, 574 (1975) ("Among other things, the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest .")

[6] A burden upon religion is found in any program "putting substantial pressure on an adherent to modify his behavior and to violate his religious beliefs." *Smith v. North Babylon Union Free School District,* 844 F.2d 90, 93 (2nd Cir. 1988), citing *Thomas v. Review Board of the Indiana Employment Security Division,* 450 U. S. 707, 718 (1981).

to this matter. The goal of widespread "prophylactic" immunization is "herd immunity." Not every child needs to be vaccinated for the program to succeed. And it is to be emphasized that the claims for relief in this matter are **not** claims of immunity from proper exercise of the Police Power vested in the Public Health authorities.

This case presents an issue of freedom of choice which, astonishingly, has **never** been subject to disciplined legal analysis. Blind adherence to "precedent" has allowed the public health authorities to have unnecessary and inappropriate power over citizens, and the habit has been developed on the basis of a single case announced almost one hundred years ago, whereby such authorities can run roughshod over important rights. Some courts have allowed this to occur wholesale, some have afforded marginal protection. But none have applied the developing—and now mainstream—constitutional law of the land to the questions of when, and whether, **prophylactic** immunization can be forced upon families. The legal foundations of the cases depend, with no basis in reality, upon the presence of an ongoing public health emergency.

Thus, "vaccine jurisprudence" features draconian cases, which allow public health authorities to take children from their families, vaccinate them, and return them. Similarly misbegotten court decisions can be found which characterize the refusal to vaccinate as "child neglect." These cases are premised **entirely** on the fallacious notion that the unvaccinated pose a danger to society at large. Another premise from archaic caselaw posits that the individual cannot question the "progressive" outlook, the "legislative finding" that

vaccines are a **beneficial** health measure to which, it follows, every citizen must submit.

Such submission to prophylactic medical treatment, the State will argue, is a matter of civic duty. But the ramifications of this civic duty are changed. The public health imperative of vaccination has metamorphosed greatly. Statutes like § 6-18-702—which make vaccination a condition precedent to public schooling—were developed in the 19th Century in the front-line fight against rampant smallpox. Today, "mandatory vaccination" is simply a precautionary campaign targeting every disease, common or not, against which the pharmaceutical companies can devise a pharmaceutical defense. In Ashley Boone's case, where the "public health" concern is Hepatitis B, a mandate for the use of condoms would arguably be just as effective as the vaccine[7].

Vaccine programs with exclusion from school as a sanction to enforce compliance are simply a sacred cow. Therefore, this Court must place into proper constitutional context the ancient all-or-nothing premise that a "health decision," when subject to determination

---

[7]Courts have recognized the religious nature of Mrs. Boone's objection herein, which is *inter alia* that programs must not promote promiscuity. Thus, in *Curtis v. School Commission,* 420 Mass 749, 652 N.E.2d 580, 52 ALR 5th 887 (1995), the Court recognized that religious beliefs were indeed the source of objection to contraception and premarital sex. The fact that there was no penalty for following these beliefs—*i.e.,* declining to have the child participate in the program—was the only saving grace for the condom distribution program in the schools. Similarly, in *Alfonso v. Fernandez,* 195 App. Div. 2d 46, 606 N.Y.S.2d 259 (2d Dept. 1993), invalidating a condom distribution program for its lack of parental consent, the court found that the religious component of the objection was not impinged, but **only** by virtue of the lack of coercion. In the vaccine program, with the coercion manifest, there is no such saving virtue.

by the Legislature, is **taken away** thereby from the individual citizen[8], that it is not a matter of **any** "choice," save for those who qualify for legislative grace. This brief will focus on one species of "choice," the exercise of religious conscience.

The State has stated its positions in a summary judgment motion of its own. The central legal theory which the State would apparently derive from the cases, new[9] and old[10], is constitutionally defective. The "right" of the State to "mandate" vaccination is **not** the issue. *Dicta*, then, for example from the U.S. Supreme Court in *Zucht*, is **not** authority for the proposition that the law is "settled" in its justification for the State's position. This brief will anticipate that very argument, and demonstrate that disciplined constitutional

---

[8]The brief in support of another Motion for Summary Judgment of even date, premised upon the Plaintiff's claims under the Fourteenth Amendment, draws a tighter focus on the issue of "legislative" determinations regarding individual health choices, with reference to the "freedom of choice" jurisprudence which *inter alia* underlies the judicially created constitutional right to "nontherapeutic" abortion.

[9]Plaintiff has long been advised that the State will rely on *Employment Division, Oregon Department of Human Resources v. Smith*, 494 U.S. 872 (1990), and claim that the case is dispositive, by virtue of the "approval" therein (at 494 U.S. 889) of an Arkansas "forced vaccination" case, *Cude v. State*, 237 Ark. 927, 377 S.W.2d 816 (1964).

[10]The State will rely on *Jacobson v. Massachusetts,* 197 U.S. 11 (1905) and *Zucht v. King,* 260 U.S. 174 (1922) for the proposition that forced vaccination for school children is "constitutional." In the former, the Court pronounced that the Public Health power to "mandate" vaccination, as reiterated by *Zucht* (page 176), is "within the police power." But in *Zucht*, the writ of review was dismissed, and the Court found that the "exemption" claim, as it were, could only be raised by *certiorari*. Thus, **all** insight from *Zucht* is *dictum*. Its only pronouncement is that public health ordinances have constitutional "validity."

analysis—a necessity herein—has been missing from the scattered[11] caselaw.

An appreciation of history is necessary in this matter. **Long** before *Jacobson,* the statutory scheme of barring unvaccinated children from schools was prevalent. But so was smallpox[12]. Moreover, constitutional history has seen an explosion of evolution in the century which unfolded after *Jacobson*[13]. It was six decades **after** *Jacobson* before the Constitution was recognized as the source of conscientious objection[14]—on the basis of

---

[11]The scatter of doctrine in this area, as well as the conspicuous paucity of sound constitutional analysis, is demonstrated by an annotation from the year 2001, found at 94 ALR5th 613 ("Power of Court or Other Public Agency to Order Vaccination Over Parental Religious Objection"). *Compare,* Annotation, 21 ALR5th 248 ("Power of Court or Other Public Agency to Order Medical Treatment Over Parental Religious Objections for Child Whose Life is Not Immediately Endangered.")

[12]The Court in *Jacobson* cited cases from Indiana, Georgia, North Carolina, California, Connecticut, Vermont, Pennsylvania and New York, stating, "the principle of vaccination as a means to prevent the spread of smallpox has been enforced in many states by statutes making the vaccination of children a condition of their right to enter or remain in public schools." *Id.,* 197 U.S. at 31-32. In an extensive footnote, the Court discussed the British vaccination program against smallpox, started in 1808. The statistical discussion therein regarding the utility of smallpox vaccination undoubtedly underlies the holding of *Jacobson* that the petitioner had no right to question the decision of public health authorities to require smallpox vaccination. This discussion is not dispositive "precedent" with regard to the necessity for forcing Ashley Boone to receive Hepatitis B vaccine in the 21st Century.

[13]In the day of *Jacobson* a citizen could be—as stated therein— "compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests, or even his religious or political convictions, to take his place in the ranks of the army of his country, and risk the chance of being shot down in its defense." *Id.,* 197 U.S. at 29.

[14]Though it construed a statute rather than the Constitution itself, *United States v. Seeger,* 380 U.S. 163 (1965) is properly read as addressing constitutional limits inherent in the draft statute; the case is therefore applicable to First Amendment analysis generally. See

(continued...)

religious belief—to the conscription of a citizen into the military service to his country. And conscription is the essence of the statutory demand. The Vaccine Program and its Arkansas appendages are very much a conscription program, one with an unexamined basis in the constitution. The *raison d'etre* for the draconian statutory template was a specific war, won long ago[15].

This Court will find that a religious exemption is the constitutional right of Cynthia Boone, absent a clear and present danger that contagious disease will be spread in the Cabot Schools. Exclusion from schools is not the least restrictive means of forwarding the state interest—compelling or not—in the achievement of herd immunity.

## ARGUMENT

## I. "COMPELLING INTEREST" ANALYSIS IS REQUIRED

### A. The Religious Focus of The Arkansas Statutes

The starting point of analysis in this matter is the standard of scrutiny. Unless the State's scheme can be considered a "neutral, generally applicable" law, it can be justified only on the basis of a compelling governmental interest, and must undergo "the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 546 (1993). The scheme is therefore all but doomed; "(a) law that targets religious conduct

---

[14](...continued)
*Malnak v. Yogi,* 592 F.2d 197, 203-05 (3d Cir. 1979) (Adams, J., concurring); Note, Toward a Constitutional Definition of Religion, 91 Harv.L.Rev. 1056, 1064 & n.56.

[15]The World Health Organization (WHO) announced the eradication of smallpox in 1980. This is a fact which is not in reasonable despite.

for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Ibid.*

The statutory focus of subsection (d)(2) upon "religious tenets" and "recognized" churches or religious denominations totally refutes the notion of statutory—much less religious—"neutrality." And *Smith* is a retrenchment, of no bearing in this matter, wherein a tradition of "compelling interest" analysis—and concomitant creation of religious exemptions[16]—was curtailed in the judicial analysis of "neutral laws of general applicability." The *Smith* focus was on laws "***not directed toward a particular religious practice* or group**" whereby "the law may ***incidentally impair*** religious action." *United States v. Meyers*, supra at 1497, emphasis added. Because the State's scheme for "regulating" the exercise of religious exemption rights is most obviously neither neutral, nor a law of general application, "compelling interest" analysis must be applied.

The compelling interest analysis required herein, long before *Smith*, had been defined and refined by the U.S. Supreme Court, *e.g.*, under *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972). *Thomas, supra*, in 1981, set forth a simple articulation of the test. When the State enacts legislation that intentionally or unintentionally places a burden upon religiously motivated practice, it must justify that burden by "showing

---

[16]A good history of the changing "contours of 'undue infringement' on religious freedom," is set forth in *U.S. v. Meyers*, 906 F.Supp. 1494, 1496 (D. Wyo. 1995) (noting the "ironic vengeance" of Congress in repudiating *Smith* with the Religious Freedom Restoration Act.)

that it is the least restrictive means of achieving some compelling state interest." *Id.,* 450 U.S. at 718. A "substantial burden" is imposed where a person is compelled to choose between the exercise of his religious beliefs and participation in a public program. Such a Hobson's Choice is clearly unconstitutional. *See Everson v. Board of Education,* 330 U.S. 1, 16, 67 S.Ct. 504, 511-12, 91 L.Ed. 711 (1947). Any coercive effect, direct or indirect, is improper.

Because the Arkansas statute is not "neutral," *Smith* does not constitute a controlling authority for the proposition that traditional "compelling interest" analysis is **not** to be utilized. Similarly, *Smith* does not constitute authority for the proposition that the archaic Arkansas case of *Cude v. State, supra,* is controlling in this matter. If, as anticipated, the State relies on the *obiter dicta* of *Smith* to contend that *Cude* and its companion cases[17] are good constitutional law, this Court must set the matter straight. These cases embody an absolutist philosophy with regard to vaccination, and stand for the proposition that refusal to vaccinate is child neglect. The upshot of these "civic duty" cases is forced vaccination, whereby a guardian may be appointed for the unvaccinated child, to effectuate vaccination before the child is returned to the haven of family.

The standard of scrutiny, as practical matter, will determine the outcome. The

---

[17]*See Mannis v. State,* 398 SW 2d 206 (Ark. 1966) (neglect petition upheld for child whose parents objected to smallpox vaccination); *Wright v. DeWitt School District No. 1 of Arkansas County,* 385 S.W. 2d 644 (Ark. 1965) (finding that vaccination law was "reasonable requirement" of legislation such as to overcome religious objection; parents not entitled to prove lack of imminent, grave, or present danger from smallpox).

Arkansas state cases abjure "compelling interest" scrutiny; two (*Cude* and *Mannis*) with no discussion whatever, the other (*Wright*) with a brief statement that *Sherbert, supra,* is inapplicable to a "public health" case.  Yet *Smith* does not so hold, stating simply that **if** compelling interest scrutiny were universally applicable in religious freedom cases, that the resulting "presumption of invalidity" **would invalidate** such programs as vaccination, which, in the words of the *Smith* Court, constitute "regulation of conduct *that does not protect an interest of the highest order.*" *Id.,* 494 U.S. at 888, emphasis added.

*Inter alia,* because this case involves a statute directed toward the regulation of religious belief, compelling interest scrutiny **is** required.  The *Smith* Court itself bluntly stated, in fn. 3 at 886, "we strictly scrutinize governmental classifications based on religion," citing *McDaniel v. Paty,* 435 U.S. 618 (1978); and *Torcaso v. Watkins,* 367 U.S. 488 (1961). Most importantly, the *Smith* case creates a new analytical doctrine, an apparently mandatory reason under the circumstances of this case for the exercise of "compelling interest" scrutiny.

## B. The Hybrid Rights Doctrine

As the Eighth Circuit has recognized, even "after the Court's decision in (*Smith*)," there are "two remaining paths for advancing a free exercise claim." *Cornerstone Bible Church v. City of Hastings,* 948 F.2d 464, 472 (8th Cir. 1991).  Both paths are open herein; the first, as described above and in *Cornerstone, ibid.,* is that the religious exemption portion of the statute "directly regulates religious worship."  Second, the mandatory vaccination portion of the statute "infringes on . . . 'hybrid rights.'" *Ibid.* "Hybrid rights" are the new

12

touchstone of compelling interest analysis. *Cornerstone* explains, *ibid*:

> "In *Smith*, the Court held that a neutral law of general applicability that incidentally impinges on religious practice will not be subject to attack[18] under the free exercise clause. Id. 110 S.Ct. at 1600. However, the Court left open the viability of free exercise attacks on government actions that directly regulate religious belief or religious-based conduct, id. 110 S.Ct. at 1599, or that violate the first amendment in conjunction with other constitutional protections. Id. 110 S.Ct. at 1601."

The *Smith* Court itself emphasized the most significant of Cynthia Boone's "other protections" when it noted that *Smith* involved "no contention that Oregon's drug law represents an attempt to regulate religious beliefs, the communication of religious beliefs, or *the raising of one's children* in those beliefs." *Id.*,   494 U.S. at 882, emphasis added.

In view of the State's reliance on *Smith*, the instant case must be compared to the *Smith* situation.  As described in *Smith* the respondent's exemption claims (*i.e.*, seeking to avoid prohibitions against religious use of illegal drugs) went beyond previous cases:

> "Respondents in the present case, however, seek to carry the meaning of 'prohibiting the free exercise [of religion]' one large step further. They contend that their religious motivation for using peyote places them beyond the reach of a criminal law that is not specifically directed at their religious practice[19], and that is concededly constitutional as applied to those who use the drug for other reasons." *Id.*, 494 U.S. at 878.

Plaintiffs have maintained throughout that **nothing** is "concededly constitutional"

---

[18]"Not subject to attack" is the strongest implicit statement that compelling interest analysis is determinative of outcome.

[19]*Smith* is **most** inapposite to a statute which **does**, intentionally, place a certain "recognized" group of religious adherents beyond the scope of a criminal law, *i.e.*, the provisions of subsection (e) of A.R.C. § 6-18-702.

about the limitations on exemption of the Arkansas statute, **nor** the sanctions of 18th Century school children's vaccination statutes. More importantly, even for "application of a neutral, generally applicable law to religiously motivated action," the Supreme Court's previous cases feature a great number of decisions, valid under *Smith*, which resulted in judicially-created religious exemptions[20]. In *Smith,* the Court characterized **all** of these as cases which "have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections." *Ibid.* Nonetheless, these decisions are many and varied. Their exemptions rested on combinations of the protected rights which are impacted in this case:

> "*such as* freedom of speech and of the press, see Cantwell v. Connecticut, 310 U.S., at 304-307, 60 S.Ct., at 903-905 (invalidating a licensing system for religious and charitable solicitations under which the administrator had discretion to deny a license to any cause he deemed nonreligious); Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943) (invalidating a flat tax on solicitation as applied to the dissemination of religious ideas); Follett v. McCormick, 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938 (1944) (same), or *the right of parents*, acknowledged in Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), *to direct the education of their children*, see Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (invalidating compulsory school-attendance laws as applied to Amish parents who refused on religious grounds to send their children to school)[21]." *Smith, supra,* 494 U.S. at 881 (Emphasis added.)

---

[20]*See* Argument III, subsection B, *infra.*

[21]In footnote 1 at page 882, the *Smith* Court reaffirmed *Yoder* (406 U.S. at 233) in a fashion which is dispositive to the question of whether the Plaintiff asserts a "hybrid right" herein which would lead to compelling interest analysis:

"* * * Yoder said that 'the Court's holding in Pierce stands as a charter of the
(continued...)

Most importantly, the discussion in *Smith* makes it clear that the invasion of nearly

**any combination** of protected rights will invoke for compelling interest analysis:

> "Some of our cases prohibiting compelled expression, decided exclusively
> upon free speech grounds, have also involved freedom of religion, cf. Wooley
> v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (invalidating
> compelled display of a license plate slogan that offended individual religious
> beliefs); West Virginia Bd. of Education v. Barnette, 319 U.S. 624, 63 S.Ct.
> 1178, 87 L.Ed. 1628 (1943) (invalidating compulsory flag salute statute
> challenged by religious objectors). And it is easy to envision a case in which
> a challenge on freedom of association grounds would likewise be reinforced
> by Free Exercise Clause concerns. Cf. Roberts v. United States Jaycees, 468
> U.S. 609, 622, 104 S.Ct. 3244, 3251-52, 82 L.Ed.2d 462 (1984) ('An
> individual's freedom to speak, to worship, and to petition the government for
> the redress of grievances could not be vigorously protected from interference
> by the State [if] a correlative freedom to engage in group effort toward those
> ends were not also guaranteed')."

The Court in *Smith* found that the facts of that unique case did not present "such a

hybrid situation, but *a free exercise claim unconnected with* any communicative activity

or *parental right.*" *Id.* at 882 (emphasis added). This Court will find its guidance instead

from *Church of the Lukumi Babalu Aye, supra,* 508 U.S. at 546 ("A law burdening religious

practice that is not neutral *or* not of general application must undergo the most rigorous of

scrutiny.  To satisfy the commands of the First Amendment, a law restrictive of religious

---

[21](...continued)
rights of parents to direct the religious upbringing of their children. And,
when *the interests of parenthood are combined with a free exercise* claim of
the nature revealed by this record, more than merely a "reasonable relation to
some purpose within the competency of the State" is required to sustain the
validity of the State's requirement under the First Amendment.'" Emphasis
added.

practice must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests").

## II. THE ENDORSEMENT OF "RECOGNIZED" RELIGION IS OFFENSIVE TO THE FIRST AMENDMENT

In *Lynch v. Donnelly*, 465 U.S. 668 (1984), the Supreme Court ruled 5-4 that the display of a Nativity Scene in a city's Christmas display was not offensive to the Constitution.  However, Justice O'Connor, concurring, pointed out that "(e)ndorsement[22] sends a message to nonadherents that they are outsiders, not full members of the political community." This is the message carried by "recognition" under Arkansas Revised Code § 6-18-702 (d)(2).

*Lynch,* however, validates an insight which no doubt animated the Legislative creation of the Arkansas religious exemption statute, observing that the Constitution

> "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any. Anything less would require the 'callous indifference' we have said was never intended by the Establishment Clause. Indeed, we have observed, such hostility would bring us into 'war with our national tradition as embodied in the First Amendment's guaranty of the free exercise of religion." *Id.,* 465 U.S. at 673, internal citations omitted.

---

[22]The so-called "endorsement" test, from *County of Allegheny v. ACLU*, 492 U.S. 573, 592 (1989), requires the Court to examine "whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion." Obviously, "recognition" is the avatar of "endorsement;" *Allegheny* holds that government unconstitutionally endorses religion whenever it appears to "take a position on questions of religious belief," or makes "adherence to a religion relevant in any way to a person's standing in the political community." *Id.,* 492 U.S. at 594.

Pursuant to *Lemon v. Kurtzman*, 403 U.S. 602 (1971), government action violates the Establishment Clause if its "principal or primary effect" is to advance or inhibit religion, and even more so if it fosters an "excessive government entanglement" with religion. *Id.* at 612-13. Arkansas Revised Code § 6-18-702 (d)(2) does exactly that. Plaintiff trusts, in fact, that the unconstitutionality of the "recognition" portion of the enactment is not subject to intellectually legitimate dispute. As clearly demonstrated in previous briefing herein, as well as the evidence at hearing, the entanglement between church and state is extensive.

### III. THE PROPER EXERCISE OF COMPELLING INTEREST SCRUTINY MANDATES A RELIGIOUS EXEMPTION FOR PLAINTIFF

The Plaintiff's earlier Combined Memorandum and Motion for Order Continuing and Extending Preliminary Injunction explicates upon two approaches, one of which whereby the Court must grant relief. First, this Court could honor the statutory intent to accommodate religious free exercise, and broaden the scope of the statutory exemption to embrace all religious objections. In the alternative, it has every power and duty to **create** a religious exemption. One of these routes is the inevitable result of compelling interest analysis. Even in light of *Smith,* the Court in *Church of the Lukumi Bayu Aye* reaffirmed the impact of the "compelling interest" standard, stating, "The compelling interest standard that we apply once a law fails to meet the *Smith* requirements is not 'water[ed] . . . down' but 'really means what it says.'" *Church of the Lukumi Bayu Aye,* 508 U.S. at 546 (quoting *Smith,* 494 U.S. at 888).

17

## A. Effectuating the Intent of the Statute

The Court has been directed, via the Plaintiff's Combined Memorandum and Motion for Order Continuing and Extending Preliminary Injunction, to the case of *Maier v. Besser*[23], which featured a pragmatic approach to a "recognized religion" statute. The *Maier* Court interpreted that statute to embrace the claims of all religious objectors and **extended** the exemption "to preserve (the statute's) constitutionality." *Id.*, p. 414. Finding that courts strike down statutes "only as a last resort," the Court noted that the person who actually practices his religious tenets "could be more sincerely a proponent of a religious faith[24]" than the person who is simply a "member" of the "recognized religion."

The same result—an expansion of statutory exemption rights to embrace **all** religious objections—was ordered in *Sherr v. Northport-East Northport Union Free School District*, 672 F.Supp. 81, 90-91 (S.D.N.Y. 1987), in reliance on *Brown v. City School District of the of Corning*, 104 Misc.2d 796, 429 N.Y.S.2d 355 (Sup.1980), *affirmed*, 83 A.D.2d 755, 444 N.Y.S.2d 878 (4th Dept. 1981) and the *Maier* case. The *Sherr* opinion also cites an

---

[23]341 N.Y.S. 2d 411 (1992).

[24]Even the notion of "tenets" prohibiting vaccination is equivocal; in *State v. Miday* 140 S.E.2d 325, 328 (N.C. 1965), the Court addressed a statue with the same requirements and limitations which are the salient features of A.R.C. § 6-18-702 (d)(2), and stated:

> "In our opinion, it is not necessary for a religious organization to forbid vaccination in order for its teachings to come within the meaning of the statute and to authorize the exclusion sought . . . . Religious organizations generally do not prohibit their members from consuming alcoholic beverages; however, no one would seriously contend that they do not teach against the consumption of alcoholic beverages by their members."

unpublished New York case, *Allanson v. Clinton Central School District,* No. CV 84-174, slip op. at 5, (N.D.N.Y. May 10, 1984), of which *Sherr* states, "then-District Judge Roger Miner, citing *Brown,* adopted a construction of the provision that eliminated the requirement of membership in a religious organization."

The "logical and nondiscriminatory basis" for this expansive remedy, as found by the *Maier* Court, at p. 414, is consistent with sound precedent. To abolish the religious exemption because its facial "favoritism" for one religion over another (as has been done, for instance, in some state court cases), would be to throw out the baby with the bathwater.

Thus Plaintiff commends to this Court the approach to statutory construction featured in the case of *Brown, supra.* In *Brown,* the trial court was required to apply the provisions of a Subdivision 9 of Section 2164[25] of the Public Health Law of New York, challenged by the parents of a kindergarten child who had not been vaccinated. The Court noted that *Sherbert* would compel a finding of "discrimination," in violation of the First Amendment[26]. *Brown,* 429 N.Y.S. 2d at 356. But the Court, which noted that the legislature passed a religious exemption in the face of health department opposition, observed, "the applicable

---

[25]The statutes of New York at the time required a "certificate" of immunization, but subsection 9 provided, "This section shall not apply to children whose parent, parents, or guardian are bona fide members of a recognized religious organization whose teachings are contrary to the practices herein required, and no certificate shall be required as a prerequisite to such children being admitted or received into school or attending school."

[26]Clearly, a law which exempts the adherents of "recognized" religions, yet denies exemption on the basis of personal, sincere religious belief, is predisposed to deny Equal Protection of law, as well.

rules of law are that every legislative enactment carries a strong presumption of constitutionality. Courts strike down statutes only as a last resort and only when unconstitutionality is shown beyond a reasonable doubt." *Ibid.*, citations omitted. Citing *Yoder,* the Court stated, "The Supreme Court has recognized that parental direction in the religious upbringing and education of children, especially in their early years, has a high place in our society." *Ibid.*

The *Brown* Court addressed the argument that extending the exemption could open a 'Pandora's Box.' Such an argument is strongly anticipated, and *a fortiori* in the event that "exclusion from school" is thrown out, as well the sanction should be. Of this interest in administrative efficiency, though, the *Brown* Court noted

> "The Supreme Court, in *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972), recognized that, 'The establishment of prompt efficacious procedures to achieve legitimate State ends is a proper State interest worthy of cognizance in constitutional adjudication. But the Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones.' (citations omitted)."

And thus the *Brown* Court concluded its constitutional analysis at p. 357:

> "The free exercise of religion is a fundamental right under the Constitution and, therefore, susceptible of restriction only to prevent 'grave and immediate danger' to interests which the State may lawfully protect. *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). In the case at bar, no 'grave and immediate danger' was shown."

### B. Judicially Creating the Exemption

The judicial creation of a religious exemption—even to a "neutral" law of general application—has a long history, from the 1940's when religious exemptions applied to anti-solicitation laws involved with *Cantwell v. Connecticut*[27], *Murdock v. Commonwealth of Pennsylvania*[28], and *Follett v. Town of McCormick, S.C.*[29], to the 1972 creation of a religious exemption from compulsory school attendance in *Yoder*. The Supreme Court's unemployment cases, *Thomas, Hobbie v. Unemployment Appeals Commission of Florida*[30], and *Frazee v. Illinois Department of Employment Security*[31] likewise follow a judicial exemption paradigm. The limit of such, as expressed *e.g.,* in *Braunfeld v. Brown,* 366 U.S. 599 (1961) and *U. S. v. Lee,* 455 U.S. 252 (1982), is the threshold of practical impossibility, of destructive impact upon an area of indispensable governmental activity.

This constitutional limit is practically a recapitulation of the "least restrictive means" test under compelling interest analysis. **If** there is **no way** to accomplish the vaccination program in the presence of exemptions, the religious interests impacted by the program might have to yield. That is, citing *Thomas* and *Sherbert,* the *Lee* Court stated, 455 U.S. at

---

[27]60 S.Ct. 900 (1940).

[28]63 S.Ct. 870 (1943).

[29]64 S.Ct. 717 (1944).

[30]480 U.S. 136 (1987).

[31]489 U.S. 829 (1989).

259, "Religious beliefs can be accommodated," and citing *Braunfeld,* continued, "but there is a point at which accommodation would "radically restrict the operating latitude of the legislature." And thus the conclusion, "(t)o maintain an organized society that guarantees religious freedom to a great variety of faiths requires that some religious practices yield to the common good." Nonetheless, the claims of Mrs. Boone fall on the easy-to-accommodate side of the dividing line.

The argument might be made—and has been [32]— that to extend religious exemptions is to "establish" religion. But the constitutional thrust of that argument has been rejected by the Supreme Court, in *Hobbie, supra,* 480 U.S. at 144:

> "Finally, we reject the Appeals Commission's argument that the awarding of benefits to Hobbie would violate the Establishment Clause. This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause. See, e.g., Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (*judicial exemption* of Amish children from compulsory attendance at high school); Walz v. Tax Comm'n, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (tax exemption for churches). As in Sherbert, the accommodation at issue here does not entangle the State in an unlawful fostering of religion." Emphasis added.

The *Hobbie* Court explained that in creating a religious exemption, "plainly we are

---

[32]*See, e.g., Brown v. Stone,* 378 So.2d 218 (Miss. 1979), a misguided case setting aside a statutory religious exemption on "equal protection" grounds, *i.e.,* reasoning that a statutory favor to a religious minority discriminates against the majority of school children. The case features an ludicrous emphasis on the "crippling and deadly" nature of the diseases which the law targets—query, where do chicken pox and Hepatitis B fit into such a rationale—along with the illogical supposition that unvaccinated children are a danger to the vaccinated children they meet in schools.

not fostering the 'establishment' of the Seventh-day Adventist religion in South Carolina,

for the extension of unemployment benefits to Sabbatarians in common with Sunday

worshipers reflects nothing more than the governmental obligation of neutrality in the face

of religious differences." *Id.,* 480 U.S. at 144.

### IV. THE LACK OF A CLEAR AND PRESENT DANGER IS FATAL TO THE CONSTITUTIONALITY OF THE EXCLUSION-FROM-SCHOOL SANCTION

In *Sherbert*, the Supreme Court declared that, in order to restrict religious exercise,

the State must advance "paramount interests." *Id.,* 374 U.S. at 406 (quoting *Thomas v.

Collins*, 323 U.S. 516, 530 (1945). Similarly, in *Yoder*, the Court announced that it would

defer only to "interests of the highest order." *Id.,* 406 U.S. at 215. The modern "interest"

in vaccination is simply widespread participation.

Herd immunity was not the central concept in 1905. And *Jacobson,* at 197 U.S. 35,

refusing to address evidence concerning the actual need for the petitioner to be vaccinated,

observes, "what the people believe is for the common welfare must be accepted as tending

to promote the common welfare, whether it does in fact or not."

The Supreme Court no longer abjures scrutiny with regard to the dangers which are

to be addressed by statutes which require uniform compliance. For instance in *Sherbert,* the

"integrity of the insurance fund" was an argument ("the filing of fraudulent claims by

unscrupulous claimants feigning religious objections to Saturday work might . . . dilute the

unemployment compensation fund") against the judicial creation of a religious exemption

from Sunday employment. But that argument was evaluated and rejected by the Court. *Id.,* 374 U.S. 407. And in *Thomas,* fn. 12 at 450 U.S. 718, the Court stated, "There is no evidence in the record to indicate that the number of people who find themselves in the predicament of choosing between benefits and religious beliefs is large enough to create 'widespread unemployment,' or even to seriously affect unemployment."

In fact, the *Sherbert* opinion **draws the line** at clear and present danger. At 374 U.S. 402, *Sherbert* relates:

> "the Court has rejected challenges under the Free Exercise Clause to governmental regulation of certain overt acts prompted by religious beliefs or principles, for 'even when the action is in accord with one's religious convictions, (it) is not totally free from legislative restrictions.' Braunfeld v. Brown, 366 U.S. 599, 603, 81 S.Ct. 1144, 1146, 6 L.Ed.2d 563. The **conduct or actions so regulated have invariably posed some substantial threat to public safety**, peace or order."

*Sherbert* went on to immediately thereafter cite *Jacobson,* as a matter of **explicit** recognition—missing in the vast majority of cases citing *Jacobson*—of the declared health emergency which was the underpinning of that case. There is no evidence whatsoever that granting an exemption to **all** Arkansans with religious objection to vaccination—or certain vaccines—would threaten the "herd immunity" which is the goal of the modern immunization effort.

Thus is demonstrated an approach now required by the Constitution which stands in

sharp contrast to the dialectical—and outdated[33]—cases which expand on *Jacobson*, whereby to view the question as "all-or nothing." Such cases unquestioningly view **universal** vaccination as the prerogative of the state. It must be emphasized that Cynthia Boone seeks no recognition of a "right" to expose school children to danger, by refusing to countenance the **prophylactic** vaccination of her daughter with dozens of doses of twelve different vaccines[34].

The "judicial notice" approach to assuming that all vaccines are necessary for all children will not withstand legal[35] or factual scrutiny. In passing the National Childhood Vaccine Injury Compensation Act, 42 U.S.C. § 300aa-10 *et seq.,* Congress found, "In the past, the medical problems that can be associated with the vaccines that are given to children have sometimes been overlooked. More recently, however, information has become available about the potential hazards of these vaccines and about the serious—and sometimes deadly—consequences they can have." H.R. Rep. 99-908, 99th Cong., 2nd Sess. 1986, 1986 U.S.C.C.A.N. 6344, 1986 WL 31971 (Leg.Hist.).

---

[33]In *Wright v. DeWitt School District, supra,* the Arkansas state court wrote, "It is well known that smallpox is a contagious disease which is a scourge to mankind. Furthermore, it cannot be said that the boundaries of a county present any barrier to the spread of this infectious disease. Our courts, both state and federal, take judicial notice of the very nature of this loathsome disease and that it presents a clear and ever present danger which is best controlled by health measures such as the one in question."

[34]The requirements for entry into school, irrespective of grade, incorporate the recommendation of a dozen vaccines, most of which must be administered in multiple doses. See the State's Exhibit Number 8 and the testimony of Dr. Bourne, TR at 131.

[35]*See* FRE 201, the modern law of judicial notice.

Moreover, the lack of a choice is troubling. Congress went on to write, *ibid*:

> "While it is true that some children, because of their physical condition, are more likely to react to a vaccine, vaccine reactions are not completely foreseeable. There is today no 'perfect' or reaction-free childhood vaccine on the market. A relatively small number of children who receive immunizations each year have serious reactions to them. But it is not always possible to predict who they will be or what reactions they will have."

Plaintiff refers this court to the findings, filed herein, in the "Magistrate Judge's Report and Recommendation" issued on December 3, 2001, in the *McCarthy* case. These were recited in pertinent part in Plaintiff's Combined Memorandum And Motion For Order Continuing And Extending Preliminary Injunction, filed on or about December 12, 2001. From the record, this Court may make similar findings. It is simply impossible to prove that the grant of a religious exemption to Ashley Boone is in any way likely to impair the vaccination effort in Arkansas. On the basis of such an undisputed fact, the Court must find in favor of judicial exemption.

## CONCLUSION

The Arkansas General Assembly cannot constitutionally favor the tenets of one religion over another. Yet it has **only** favored the Arkansas citizen with an exemption, who hears a dogma from the preacher standing behind a pulpit, explicitly exhorting followers to abjure from resort to medicine. It is necessary for this Court to pronounce that the quiet religious conscience of the Plaintiff herein has equal voice under the Constitution. Arkansas and American citizens have a sacred right to hear a quiet and individual voice—their own religious conscience—and obey its command. The efficacy of a religious claim cannot be

required to pass or fail on the basis of anybody's subjective sense of orthodoxy.

The values of the First Amendment require relief from the statutory impositions foisted upon the Plaintiff. This Court must declare the right to conscientious objection on the basis of religious objection, to the extent of exemption from "mandatory" vaccination in the absence of emergency. An appropriate permanent injunction must issue.

Respectfully submitted this 30 day of April, 2002.

PRYOR, ROBERTSON
& BARRY, PLLC
315 North 7th Street
P.O. Drawer 848
Fort Smith, AR 72902-0848
(501) 782-8813

Gregory T. Karber
Ark. Bar No. 79110
Attorney for Plaintiff

ROBERT T. MOXLEY #5-1726
GAGE & MOXLEY, PC
623 West 20th Street
Post Office Box 1223
Cheyenne, Wyoming 82003-1223
(307) 632-1112

# CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I served the requisite number of copies of the

foregoing document, to the entity or entities listed below, by placing same into the hands of

the delivery service designated below, on this 30 day of _____April_____, 2002.

UPS Next Day Delivery [    ] United States Mail [  ] Federal Express [    ] Overnight Mail [ ✓ ] _____ [    ]

WILLIAM C. BRAZIL, ESQ.
913 Oak Street
Conway, Arkansas 72032

ROBERT M. BRECH, ESQ.
Associate General Counsel
Arkansas Department of Health
4815 Markam Street, Slot 31
Little Rock, Arkansas 72205-3867